**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Wendy J. Butler,                                :        Case No. 3:08CV1628

     Plaintiff,                             :

vs.                                             :        **MAGISTRATE'S REPORT**
                                                         **AND RECOMMENDATION**

Commissioner of Social Security Administration, :

     Defendant.                             :

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423.  Pending are the parties' briefs on the merits to which Plaintiff filed a Reply (Docket Nos. 17, 20 and 24).  For the reasons set forth below, it is recommended that this case be remanded to the Commissioner pursuant to Sentence Four of 42 U. S. C. § 405(g).

## PROCEDURAL BACKGROUND

On July 13, 2004, Plaintiff filed an application for DIB alleging that she became unable to work because of her disabling condition on September 1, 2003 (Tr. 72-74).  The application was denied initially and upon reconsideration (Tr. 60-62, 55-57).  At an administrative hearing conducted on July 19, 2007, before Administrative Law Judge (ALJ) Terry Miller, Plaintiff was represented by counsel David Friedes.  Plaintiff, her husband and Vocational Expert (VE) Charles McBee testified by video (Tr. 589).  On September 27,

2007, the ALJ filed an adverse decision denying Plaintiff's claim for DIB (Tr. 16-27).  The ALJ's decision

became the final decision of the Commissioner when the Appeals Council denied review (Tr. 5-7).  Plaintiff

filed a timely action in this Court seeking judicial review of the Commissioner's decision denying benefits.

## FACTUAL BACKGROUND

1.    *Plaintiff's Testimony*

At the time of hearing, Plaintiff was 39 years old, 5'5" tall and weighed 125 pounds (Tr. 599).  She

was married and had custody of her minor daughter; however, her eight-year-old son lived with his father

(Tr. 600).  Her husband was employed as a sprinkler installer and service person (Tr. 600).  Through July

2004, Plaintiff's source of income was  unemployment compensation (Tr. 602).

Plaintiff, a high school graduate, also took courses in cosmetology  (Tr. 601).    She was last

employed, however,  as a data entry specialist.  She stopped working when her job was abolished (Tr. 601-

602).  During the past fifteen years, Plaintiff had been employed as a billing clerk and accountant, waitress,

bar maid and cashier (Tr. 602-604).

Plaintiff described her impairments as follows:  a menstrual disorder, memory loss, cephalgia,

lightheadedness, diabetes, transient ischemic attacks (TIAs), diabetic neuropathy, persistent constipation,

depression and anxiety (Tr. 604-606, 610, 612, 618).  Drug therapy was prescribed for her diabetes; however,

the medication did not improve her neuropathy (Tr. 608).  Prescribed headache medication  caused her to

sleep until the headache dissipated (Tr. 611).  Plaintiff estimated that she had at least thirty headaches

monthly (Tr. 629).  Plaintiff was prescribed an iron supplement and medication to relieve constipation (Tr.

612).  The side effects of the prescribed anticoagulant included profuse bleeding if Plaintiff were cut or

scratched (Tr. 627, 628).

Plaintiff treated with an ophthalmologist biannually for blurred vision caused by diabetes (Tr. 609-

610).  She had undergone two laser surgeries in 2000 (Tr. 609).

The onset of TIAs was unpredictable and without warning (Tr. 610, 626).  For instance, she had two TIAs in 2001 but she had three attacks during the year preceding the hearing (Tr. 610).  The attacks were characterized by loss of consciousness, mouth numbness, paralysis, slurred speech, lack of concentration and headaches (Tr. 610, 611, 617).

The symptoms of depression and/or anxiety included nervousness, fear, memory loss, procrastination, inability to talk in a social setting and a general feeling of darkness (Tr. 618, 619).

Plaintiff suggested that she could not walk without support for more than fifteen minutes and she could not stand in one place for more than fifteen minutes (Tr. 614).  There were no limitations on the amount of time she could sit until she needed to lie down (Tr. 615).  However, prolonged sitting caused her legs to swell (Tr. 630).  The extent of her ability to lift and/or carry was limited to carrying groceries into the house, one or two bags at a time, putting milk in the refrigerator and putting plates in the cupboard (Tr. 615).  She had difficulty gripping with both hands but she could turn a knob, keyboard, and pick up coins (Tr. 615, 616).  She dropped baskets (Tr. 631).  Bending down was manageable but getting up was difficult.  She had problems with her equilibrium,  and she had difficulty climbing stairs (Tr. 617).

Plaintiff had no difficulty sleeping, bathing or dressing herself (Tr. 623, 625).  During a typical day, she watched "a lot" of television, completed crossword puzzles, read magazines, worked on enhancing her memory.  She "ran errands" when she had doctors' appointments (Tr. 625).  She did the laundry, vacuumed and dusted as needed (Tr. 624).  Occasionally, she prepared meals (Tr. 623).  She took her daughter to school and to after-school activities (Tr. 621).  She played Yahtzee and other games on the computer for up to three hours daily (Tr. 622).  She shopped for groceries once each week (Tr. 624).

During the summer, Plaintiff watered flowers and picked beans from the garden (Tr. 625).  Sometimes

3

she fished (Tr. 625).

Plaintiff continued to smoke a pack of cigarettes daily.  Occasionally she drank wine coolers (Tr. 620).

Plaintiff claimed that she could not return to her past relevant work because she could not remember, carry, lift or stand for prolonged periods of time (Tr. 631-635).

2.      *Ronald Butler's Testimony*

Ronald Butler, Plaintiff's spouse, observed her ability to function in the household and social settings for approximately six years.  He recalled that Plaintiff had a memory defect, a depressed mood and anger issues (Tr. 636).  Her physical incapacities included "dropping stuff" and bumping into everything (Tr. 636, 637).  During TIA episodes, he noticed that Plaintiff mumbled, stumbled over words, slurred her speech and sometimes lost her ability to express her thoughts (Tr. 637).

3.      *The VE's Testimony*

There were no objections to his qualifications; therefore, the VE identified and classified Plaintiff's past relevant work in data entry as sedentary.  Her work as waitress was performed as light work (Tr. 639).  Her job as cashier was nationally performed at the light exertional level (Tr. 640).

A hypothetical person, capable of frequently stooping, kneeling, crouching and crawling, only occasionally climbing ramps or stairs and balancing, making only simple work related decisions and making occasional changes in the work setting, could not perform Plaintiff's past relevant work either as she performed it or as it is generally performed in the national economy (Tr. 641).  Adding to the hypothetical the vocational factors of a person of Plaintiff's age, education and work history, the VE testified that Plaintiff could perform such jobs as inspector, hand packager, photocopy machine operator and folder.  A sit/stand requirement with occasional brief interactions with others and no work with the general public would eliminate the photocopy machine operator position.  This job would be replaced by a "bagger of garments"

job (Tr. 642).  If the limitation required less than a fast pace, the hypothetical person could perform jobs as a surveillance system monitor, hand mounter and waxer (Tr. 643) with 750-1,000 surveillance monitor jobs available.

Supplementing the prior hypothetical question, the ALJ asked the VE to assume that the hypothetical plaintiff could not sustain or maintain work activity on a regular and continuing basis due to mental decompensation.  Naturally, this person would be incapable of performing any work.  All work was precluded, however, if the person was only able to walk for a sustained period of fifteen to thirty minutes at a time, stand for fifteen to thirty minutes at a time, take frequent bathroom breaks and "miss work" more than one day per month (Tr. 643-644).

The VE explained that all work would be eliminated if the person could not stay on task and stay focused to produce at least 80% of the workday (Tr. 644).  The jobs that the VE recommended are simple, routine repetitive task jobs (Tr. 646, 647).  If a rate type production requirement were imposed, the available jobs would be reduced by one fourth (Tr. 648).  Pervasive manipulative problems caused by an inability to use her thumb would preclude Plaintiff from performing the jobs of inspector, hand packager, bagger and photocopy machine operator, waxer and table worker (Tr. 651).

## MEDICAL EVIDENCE

Dr. Bruce A. Montgomery commenced treating Plaintiff in April 1997.  Throughout the course of their relationship, he addressed a myriad of issues related to weight loss, swollen ankles, difficulty swallowing, episodes of dizziness and a pleuritic chest (Tr. 349, 350, 352, 378, 379, 380).  He was meticulous in testing Plaintiff's blood sugar levels and adjusting her insulin accordingly (Tr. 343, 344, 347, 349, 369-378).  Dr. Montgomery diagnosed Plaintiff with tenosynovitis of the right thumb with a trigger joint (Tr. 363-364).  He observed that Plaintiff was suffering from a social phobia (Tr. 362).  For a short time, Dr. Montgomery

prescribed an antidepressant to treat anxiety and social phobia (Tr. 357-361).

Plaintiff was treated for diabetic ketoacidosis on May 15, 1998 (Tr. 436).

Dr. Carol Kollaritis diagnosed Plaintiff with early diabetic retinopathy in both eyes on February 10, 1999 (Tr. 434).  She addressed multiple leaking in both retinas on April 28, 1999.  She performed a laser treatment on the right eye (Tr. 432).  Dr. Kollaritis attributed an episode of double vision occurring on or about January 24, 2000, to diabetic neuropathy (Tr. 431).

Dr. I. S. Elliot, Endocrinologist, commenced treating Plaintiff on May 17, 2000, performing periodic testing for purposes of controlling Plaintiff's diabetes and attendant neuropathies with drug therapy (Tr. 157-179).  On June 2, 2000, Plaintiff was treated for a hypoglycemic reaction from failing to use her insulin (Tr. 433).

Plaintiff's right hand showed no evidence of fracture or dislocation on January 25, 2001.  However, in April 2001, Plaintiff's injury to her thumb was treated with an injection in the thumb (Tr. 410, 411).

The glucose levels in Plaintiff's urine were abnormal when tested on June 18, 2001 (Tr. 183).  On June 22, 2001, the computed tomographic (CT) scan of Plaintiff's brain showed tissue death in the left cerebral peduncle (Tr. 181).  Plaintiff's carotid duplex was normal (Tr. 182).

Dr. Montgomery noted that Plaintiff had a left sided stroke on or about June 27, 2001.  He prescribed Plavix as preventive medicine (Tr. 353).

Plaintiff's right trigger thumb was released from a narrowing tendon passageway on September 6, 2001 (Tr. 276-282).

Plaintiff was hospitalized on September 30, 2001, to prevent further embolic events (Tr. 255-267).  The results from the non-contrast CT scan of the brain and echocardiogram were negative (Tr. 266, 267, 268, 269, 405, 407, 409).

On November 1, 2001, Dr. Franz J. Berlacher, a fellow of the American College of Cardiology,

6

diagnosed Plaintiff with insulin dependent diabetes mellitus, diabetic neuropathy and a cerebral vascular (CVA) accident (Tr. 190).

Dr. Mohammed Maaieh performed a transesophageal echocardiogram on November 13, 2001, finding a normal systolic function of the left ventricle, minimal patent foramen without evidence of atrial or ventricular septal defects (Tr. 250).

In December 2001, Plaintiff's urine tested positive for nitrates and her glucose levels were elevated (Tr. 194, 196).

On January 7, 2002, Plaintiff underwent the removal of a tumor in her right breast (Tr. 238-243). The mass showed no evidence of active disease (Tr. 243).  In March 2002, Plaintiff underwent laser treatment for diabetic retinopathy (Tr. 204).

Dr. Peter P. Zangara conducted neurological evaluations once annually in 2001, 2002 and 2003 (Tr. 207-212).  His significant notations include the fact that the fluctuation in Plaintiff's blood sugar levels was the source of confusion on other medical issues; however, she had good recovery from past ischemic brain injury (Tr. 210, 212).

On March 14, 2003, the magnetic resonance imaging (MRI) of the brain showed negative results (Tr. 236).  In March 2003, Dr. Montgomery found that Plaintiff had an abnormal glucose level (Tr. 399).  In November 2003, he tested Plaintiff for lupus as well as a hereditary hyper coagulability disorder.  Both results were negative (Tr. 388, 389).

Plaintiff's glucose level was low when measured on September 15, 2003 (Tr. 235).

In an attempt to rule out cardiovascular disease, an MRI of Plaintiff's brain was administered on September 24, 2003.  There was no indication of an acute infarction or acute intracerebral process (Tr. 230).  Plaintiff was diagnosed, however, with vertigo/alteration of mental status (Tr. 231).

The echo-doppler examination conducted on October 2, 2003, showed normal results (Tr. 228).  There

was no evidence of carotid artery stenosis on October 20, 2003 (Tr. 225).

Plaintiff's potassium, glucose and cholesterol levels were elevated above the normal range on April 19, 2004 (Tr. 386).

On May 19, 2004, the MRI of Plaintiff's brain showed no evidence of hemorrhage or mass effect (Tr. 222).  The results of the electroencephalogram administered on July 14, 2004, were within a normal range for a mostly awake adult (Tr. 221)

Dr. Khalid Mahmood conducted a clinical interview on October 5, 2004, finding no significant fine or gross motor function abnormalities (Tr. 284).  In fact, Dr. Mahmood found that Plaintiff's range of motion in the cervical spine, dorsolumbar spine, shoulders, elbows, wrists, hips, knees and ankles and hands/fingers was normal (Tr. 286-288).

After Psychologist Roger H. Avery conducted a clinical interview on October 8, 2004, he diagnosed Plaintiff with a cognitive disorder, personality disorder, diabetes, hypertension, post stroke problems and some moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 295).  He also noted that Plaintiff suffered from borderline verbal intelligence; consequently, her ability to maintain, understand, remember and follow instructions was moderately impaired.  Her ability to withstand the stress and pressures of day-to-day work activities was mildly impaired (Tr. 295-296).  Plaintiff scored in the low average range for intellectual functioning (Tr. 293).  Her immediate auditory and memory scores were within the mild mental retardation range (Tr. 294).

Dr. Denise Kohler, Ph.D., opined on January 3, 2005, that Plaintiff had a psychological or behavioral abnormality as evidenced by her memory impairment, a cognitive disorder, a reading disorder and a personality disorder (Tr. 439, 445).  In her opinion, Plaintiff suffered from a moderate degree of limitation in her restrictions to activities of daily living, a mild degree of limitation in difficulties maintaining social functioning and a moderate degree of limitation in difficulties in maintaining persistence, concentration and

8

pace (Tr. 448).  She concluded that Plaintiff suffered from mild limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek and respond appropriately to changes in the work setting (Tr. 452, 453).

There was evidence of compression deformity at L1 and L2 in Plaintiff's back on February 17, 2005 (Tr. 381).  There was, however, no evidence of acute fracture or disc herniation (Tr. 382).

On April 19, 2005, Dr. Lynne Torello, a family practitioner, reviewed Plaintiff's file and concluded that Plaintiff could:  (1) occasionally lift and/or carry up to twenty pounds, (2) frequently lift and/or carry up to ten pounds, (3) stand and/or walk about six hours in an eight-hour workday, (4) sit about six hours in an eight-hour workday and (5) engage in unlimited pushing and/or pulling.  The only limitation imposed by Dr. Torello was that Plaintiff could never climb using a ladder, rope or scaffold (Tr. 458-459).

Dr. Montgomery prescribed drug therapy for persistent headaches on September 1, 2005 (Tr. 502).  Although her blood sugar level was consistent, Dr. Montgomery prescribed a narcotic to treat back pain on September 9, 2005 (Tr. 501).  From samples collected on September 13, 2005, the abnormal results included:  micro albumin in her urine, abnormal albumin/creatinine  ratio, trace protein in urine and elevated glucose levels (Tr. 510, 511, 513, 515).

Dr. Montgomery attempted to regulate Plaintiff's blood sugar levels with medication commencing on September 15, 2005 (Tr. 490, 491, 494, 495, 498, 499, 500).  On July 19, 2006, Dr. Montgomery noted the anticoagulant was controlling the symptoms of transient ischemic attacks (Tr. 492).  Plaintiff requested help for depression; consequently, she underwent a diagnostic evaluation on July 25, 2006 (Tr. 473-476).  She was discharged on April 16, 2007 without improvement (Tr. 466).

In January 2007, Dr. Montgomery was notified that Plaintiff's diabetic retinopathy was stable in her right eye and there was minimal background diabetic retinopathy in her left eye (Tr. 483, 529).  In January

and July 2007, Plaintiff had several TIAs (Tr. 480, 484).  Dr. Montgomery completed a diabetes mellitus residual functional capacity questionnaire on July 23, 2007 in which he opined that Plaintiff was capable of performing low stress jobs provided she walk no more than fifteen minutes each time, sit no more than thirty minutes, stand no more than thirty minutes, stand/walk less than two hours, shift positions at will, take unscheduled breaks and elevate her legs at least twenty minutes (Tr. 520-523).  In his opinion, Plaintiff should never stoop, crouch or climb ladders or lift fifty pounds (Tr. 525).

## STANDARD OF DISABILITY

An ALJ engages in a five-step sequential evaluation when deciding whether a claimant is entitled to social security disability benefits pursuant to 20 C.F.R. § 404.1520(a)(4).  *McClanahan v. Commissioner of Social Security*, 474 F.3d 830, 833 (6th Cir. 2006).  During the sequential evaluation, if the claimant is found to be conclusively disabled or not disabled, the disability determination is made, and the inquiry is ended. *Id*.

The evaluation proceeds as follows:  1) the claimant's work activity is considered.  If he or she is performing substantial gainful activity, he or she will be found to be not disabled; 2) the severity of the claimant's alleged impairments is considered, including the duration; 3) the severity of the alleged impairment is considered compared to the disability listings, and if the impairment meets one of the listings, the claimant is found to be disabled; 4) if the claimant's impairment does not prevent him or her from doing past relevant work, a finding of not disabled will be made; 5) finally, even if the impairment does prevent him or her from doing past relevant work, the claimant's age, education, and work experience are considered along with the residual functional capacity to determine whether the claimant could adjust to other work.  *Id*.

## ALJ'S DETERMINATIONS

The ALJ made the following findings:

1.      Plaintiff met the insured status requirements of the Act through September 27, 2007; however,

she had not engaged in work activity since September 1, 2003, the alleged onset date of disability.

2.    Plaintiff had the following severe impairments: insulin dependent diabetes mellitus, diabetic neuropathy, diabetic retinopathy, history of cerebrovascular accidents and transient ischemic attacks with reported periods of aphasia and mental confusion related to her diabetic condition, headaches, hypercoagulability disorder, diabetic encephalopathy/cognitive disorder, reading disorder, major depressive disorder and post-traumatic stress disorder and personality disorder.

3.    Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

4.    Plaintiff had the residual functional capacity to perform a limited range of light work (lifting and carrying twenty pounds occasionally and ten pounds frequently, standing/walking/sitting six hours out of eight total), reduced by the need to alternate between sitting and standing. Plaintiff was not able to climb ladders, ropes or scaffolds, perform tasks that required constant close visual work, nighttime driving or constant oral communications. Plaintiff was able to frequently stoop, kneel, crouch, crawl, occasionally climb ramps, stairs and balance and make simple work-related decisions and perform simple, routine, repetitive one to three step tasks that are not performed in a fast paced environment. Plaintiff was restricted to work that did not involve the general public and only work that would accommodate a 4.7 grade reading level.

5.    Plaintiff, a younger individual with at least a high school education, was unable to perform her past relevant work.

6.    Considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.

7.    Plaintiff was not under a disability as defined in the Act.

(Tr. 18-27).

## STANDARD OF REVIEW

The district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan,* 474 F. 3d at 832 -833. In reviewing the Commissioner's decision, the court must only determine whether substantial evidence in the record supports the finding, and whether the ALJ applied the proper legal standards in reaching his or her decision. *Stoker v. Commissioner of Social Security,* 2008 WL 1775414, *3 (N. D. Ohio 2008) (*citing* 42 U.S.C. § 405(g);

*Brainard v. Secretary of Health & Human Services,* 889 F.2d 679, 681 (6th Cir. 1989) (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)).  The court "may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Id.* (*citing Cutlip v. Secretary of Health & Human Services,* 25 F.3d 284, 286 (6th Cir. 1994) (c*iting Richardson, supra,* 91 S. Ct. at 1427; *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984) (*citing Myers v. Richardson,* 471 F.2d 1265, 1266 (6th Cir. 1972)).  If substantial evidence supports it, the court must affirm the ALJ's decision, even if the reviewing court would decide the matter differently.  42 U.S.C. § 405(g) (1998); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Brainard, supra,* 889 F.2d at 681 (*citing Consolidated Edison Company v. National Labor Relations Board,* 59 S. Ct. 206, 216 (1938).  In determining whether substantial evidence in support exists, the court will view the record as a whole, *Id.* (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980), and consider anything in the record suggesting otherwise.  *Id.* (*citing Beavers v. Secretary of Health Education and Welfare,* 577 F.2d 383, 387 (6th Cir. 1978)).

## <u>DISCUSSION</u>

In her brief, Plaintiff alleges numerous errors in the ALJ's analysis.  The Magistrate consolidates those arguments into the following legally cognizable claims.  First, the ALJ failed to attribute controlling weight to Dr. Montgomery's opinions or give reasons for discounting such opinions.  Second, the ALJ failed to comply with 20 C. F. R. § 404.1529.  Third, the ALJ failed to consider Plaintiff's hearing loss.  Fourth, the ALJ improperly discounted Plaintiff's muscolskeletal complaints.  Fifth, the ALJ erred in adopting the State Agency Review in Assessing Residual Functional Capacity.  Sixth, the ALJ ignored evidence that Plaintiff had three TIAs in one month.  Seventh, the ALJ's use of the term "occasional" is void for vagueness.  Eighth, the ALJ erred in rejecting the Global Assessment of Functioning score.  Ninth, the ALJ erred in

attributing significant weight to Dr. Zangara's opinions.  Tenth, the ALJ erred in assessing Plaintiff's credibility.  Eleventh, the ALJ ignored the opinions of Mr. Avery and Dr. Montgomery as to Plaintiff's mental issues.  Twelfth, the ALJ wrongly analyzed Plaintiff's activities of daily living.  Thirteenth, the ALJ erred in posing the hypothetical based on the errors discussed in Plaintiff's brief**.**  Fourteenth, the Commissioner failed to meet the burden at Step Five of the sequential evaluation

**1.  THE ALJ ATTRIBUTED CONTROLLING WEIGHT TO DR. MONTGOMERY'S OPINIONS.**

Plaintiff suggests that the ALJ failed to attribute controlling weight to Dr. Montgomery's opinions reported in the "Diabetes Mellitus Residual Functional Capacity Questionnaire."  The symptoms from diabetes interfered with her ability to concentrate, caused an attention deficit and required a sit/stand option (Tr. 519-526).

In general, the opinions of treating physicians are entitled to controlling weight.  *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007) ( *See Walters v. Commissioner of Security,* 127 F.3d 525, 529-30 (6th Cir. 1997) (*citing* 20 C.F.R. § 404.1527(d)(2) (1997)).  A physician is considered a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Id.* (*Smith v. Commissioner of Social Security,* 482 F.3d 873, 876 (6th Cir. 2007) (alteration in original) (*quoting* 20 C.F.R. § 404.1502)).          If the opinion of a treating source is not accorded controlling weight, an ALJ must apply a host of factors, namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source in determining what weight to give the opinion.  *Wilson v. Commissioner of Social Security,* 378 F. 3d 541, 544 (6th Cir. 2004) (*citing* 20 C. F. R. § 404.1527(d)(2)).  To apply the correct legal standards, the ALJ's decision to reject the treating physician's opinion must be based on good and specific reasons why the treating physician rule is

13

inapplicable. *Id.*  The ALJ may rely on the traditional treating physician rule when assessing residual functional capacity. *Swain v. Commissioner of Social Security,* 297 F. Supp. 2d 986, 991 (N. D. Ohio 2003). The ALJ is not bound, however, by a treating source's conclusory statements concerning a claimant's maximum residual functional capacity. *Id.* (*citing Miller v. Social Security,* 843 F. 2d 221, 214 (6th Cir. 1988)).

It is clear that Plaintiff and Dr. Montgomery had a treating relationship.  During 2005 and 2006, Dr. Montgomery addressed several physical and mental maladies with Plaintiff, and he consistently tested her blood sugars, monitored her insulin intake and the onset  of diabetic neuropathies (Tr. 298-437, 518-526). It is obvious that the ALJ attributed considerable weight to Dr. Montgomery's opinion that Plaintiff's residual functional capacity was subject to deficits in concentration and restricted by a sit/stand option (Tr. 22).  The ALJ employed the proper legal standards in assessing Plaintiff's residual functional capacity.  The Magistrate affirms this finding.

## 2.    THE ALJ FAILED TO COMPLY WITH 20 C. F. R. §404.1529.

Plaintiff argues that the ALJ's failed to consider her medication, usage, effectiveness, dosage and side effects as required under 20 C. F. R. § 404.1529.

Title 20 C. F. R. § 404.1529 instructs the ALJ to consider information submitted by the claimant about his or her symptoms since symptoms sometimes are indicative of a more severe impairment that cannot be shown by objective medical evidence alone.  Because the claimant's own description of his or her physical or mental impairment is subjective and therefore difficult to quantify, any symptom related functional limitations and restrictions which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in reaching a conclusion as to whether the claimant is disabled.  20 C. F. R. § 404.1529 (c)(3) (Thomson Reuters/West 2009).  Factors relevant to symptoms which will be considered include the type, dosage, effectiveness, and side effects of any

14

medication taken to alleviate the symptoms.  20 C. F. R. § 404.1529(c)(3)(iv) (Thomson Reuters/West 2009).

The Commissioner is required to consider all of a claimant's symptoms in determining whether he or she is disabled.  *Woodby v. Astrue*, 2008 WL 5156342, *2 (E. D. Ky. 2008) (*citing* 20 C. F. R § 404.1529(a)).  Before these symptoms will lead to a finding of disability, however, medical signs must exist which show the claimant has an impairment which could reasonably be expected to produce the symptoms alleged.  *Id.* (*citing* 20 C.F.R. § 404.1529(b)).  When such medical signs are present, the Commissioner must then evaluate how the intensity and persistence of the symptoms affect the claimant's ability to work.  *Id.* (*citing* 20 C.F.R. § 404.1529(c); *see also Felisky v. Bowen,* 35 F.3d 1027, 1038-1039 (6th Cir. 1994) (*citing Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986)).

The ALJ made a perfunctory listing of Plaintiff's medications.  The ALJ ignored Plaintiff's statements detailing potentially disabling symptomology, their consistency with the objective medical evidence and whether these symptoms lead to a finding of disability.  The case is remanded to the Commissioner for a decision detailing the requirements of 20 C. F. R. § 404.1529.

## 3.  THE ALJ FAILED TO ADDRESS PLAINTIFF'S HEARING LOSS.

Plaintiff contends that the ALJ's decision is silent as to her hearing loss. The Magistrate finds that the record fails to include documented evidence of auditory testing or the results of auditory testing.  Neurological test results conducted in November 2001, showed intact hearing (Tr. 212).  Dr. Zangara noted no sensory loss on October 29, 2003 (Tr. 208).   Prior to psychological testing on October 8, 2004, Plaintiff denied that she had any difficulty hearing (Tr. 289).  This evidence would not lead the ALJ to suspect a hearing loss.  Plaintiff's argument on this issue lacks merit.

## 4.  THE ALJ ERRED IN DISCOUNTING PLAINTIFF'S MUSCULOSKELETAL COMPLAINTS.

Plaintiff argues that the reasoning for discounting her muscolskeletal complaints is not based on substantial evidence.

15

The muscolskeletal system gives humans the ability to move using the muscle and skeletal systems. 20 C. F. R. Pt. 404, Subpt. P. App. 1, 1.00 Musculoskeletal System (Thomson Reuters/West 2009). Diagnosis and evaluation of muscolskeletal impairments should be supported, as applicable, by detailed descriptions of the joints, including ranges of motion, condition of the musculature (e.g., weakness, atrophy), sensory or reflex changes, circulatory deficits, and laboratory findings, including findings on x-ray or other appropriate medically acceptable imaging. 20 C. F. R. Pt. 404, Subpt. P. App. 1, Muscolskeletal Systems 1.01 C 1 (Thomson Reuters/West 2009). Medically acceptable imaging includes, but is not limited to, x-ray imaging, computerized axial tomography or magnetic resonance imaging, with or without contrast material, myelography, and radionuclear bone scans. *Id.* "Appropriate" means that the technique used is the proper one to support the evaluation and diagnosis of the impairment. *Id.*

The physical examination must include a detailed description of the rheumatological, orthopedic, neurological, and other findings appropriate to the specific impairment being evaluated. 20 C. F. R. Pt. 404, Subpt. P. App. 1, Muscolskeletal Systems 1.01 D (Thomson Reuters/West 2009). These physical findings must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation; e.g., "He says his leg is weak, numb." *Id.* Alternative testing methods should be used to verify the abnormal findings; e.g., a seated straight-leg raising test in addition to a supine straight-leg raising test. *Id.* Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation. *Id.* Care must be taken to ascertain that the reported examination findings are consistent with the individual's daily activities. *Id.*

The ALJ properly discounted Plaintiff's musculosketal complaints as they were not supported by the requisite medically acceptable imaging. The evidence shows complaints of joint pain (Tr. 207) limb pain (Tr. 211) and general muscolskeletal weakness (Tr. 259). The results of the imaging that was undertaken to assess lumbar disc disease showed no motion discrepancies (Tr. 285-288) . The reasoning for discounting Plaintiff's

16

musculosketal complaints is reasonably based on the lack of evidence supporting the severity of Plaintiff's claims.

5.    **THE ALJ ERRED IN ADOPTING THE STATE AGENCY REVIEW IN ASSESSING RESIDUAL FUNCTIONAL CAPACITY.**

Plaintiff suggests that Dr. Montgomery's assessment of residual functional capacity presents a longitudinal study of medical evidence that was not available to the state agency review physician when conducting her review.  Plaintiff argues that Dr. Montgomery's residual functional capacity finding is a more accurate depiction and that, consequently, Defendant's adoption of the state agency review physician's residual functional capacity finding cannot be based on substantial evidence.

When a state agency makes the disability determination, that agency is responsible for assessing residual functional capacity.  20 C. F. R. § 404.1546 (Thomson Reuters/West 2009).  The assessment is based on all relevant medical evidence.  20 C. F. R. § 404.1545(a)(3) (Thomson Reuters/West 2009).

After careful review, the Magistrate finds that the record contains only one residual functional capacity evaluation performed by a state agency reviewing physician which was completed without the benefit of two years' medical records generated, in part, by Plaintiff's treating physician.  Since the ALJ relied significantly on the opinions of Dr. Montgomery, Plaintiff's residual functional capacity cannot be assessed without a timely and comprehensive residual functional capacity given by a medical expert.  On remand, the Commissioner may contact a treating source or state agency physician to make a renewed determination of residual functional capacity based on all the medical evidence including but not limited to the records from Harbor Behavioral and Dr. Zangara.

6.    **THE ALJ IGNORED EVIDENCE THAT PLAINTIFF HAD THREE TRANSIENT ISCHEMIC ATTACKS IN ONE MONTH.**

Plaintiff states that the ALJ failed to consider that she had three TIAs in one month.  The Magistrate finds that the record reflects that the ALJ considered evidence that Plaintiff had TIAs daily (Tr. 21).  It is

unreasonable to conclude that the ALJ failed to consider that she had three attacks in one month.

7.      THE ALJ'S FINDING THAT IS VOID FOR VAGUENESS.

Plaintiff contends that the ALJ's use of the term "occasional" could mean that she could do sitting or standing up to a third of a six-hour day before changing position.  The term "occasionally" as applied in the Act, means occurring from very little up to one-third of the time.  TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK-THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2, SSR 83-10, 1983 WL 31251, *5 (1983).

The ALJ found that Plaintiff could alternate between sitting and standing, where she could occasionally change positions throughout the eight-hour workday.  Applying the statutory definition of the term occasionally, the ALJ contemplated that Plaintiff was free to change positions or change positions as frequently or infrequently as she needed to up to two hours in a six-hour workday.  The Magistrate finds Plaintiff's  contention that she had to sit or stand for up to a third of an eight-hour day before changing position is an unreasonable interpretation of the ALJ's decision.

8.      The ALJ erred in rejecting the Global Assessment of Functioning score.

Plaintiff argues that the ALJ rejected the global assessment of functioning score reported by Harbor Behavioral Healthcare (Tr. 465-477).  It is Plaintiff's opinion that rejection of these opinions is tantamount to "playing psychologist/psychologist".

The Magistrate finds that the ALJ did not reject the global assessment of functioning provided by Harbor.  In fact, the ALJ considered the score and diagnosis that Harbor personnel attributed to Plaintiff (Tr. 21).

9.      The ALJ erred in attributing significant weight to Dr. Zangara's opinions.

Plaintiff proposes that Dr. Zangara's opinion should have been considered under 20 C. F. R. §

404.1527(d)(2).  As a generalist, Dr. Zangara's opinions should not have been afforded the same or more weight than the weight afforded the opinions of Dr. Montgomery.

Under 20 C. F. R. § 404.1527(d)(2), more weight is given to treating sources most able to provide a detailed, longitudinal picture of the claimant's medical impairments.  If well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence, the medical source's opinions are entitled to controlling weight.  20 C. F. R. § 404.1527(d)(2) (Thomson Reuters/West 2009).

Plaintiff's treatment relationship with Dr. Zangara, a board certified neurologist, was narrow in scope. He addressed issues related only to the neurological defects, specifically symptoms associated with transient ischemic attacks.  The ALJ attributed significant weight to Dr. Zangara's opinion within his area of expertise (Tr. 20).  Application of such weight was appropriate.

**10.    The ALJ erred in assessing Plaintiff's credibility.**

Plaintiff argues that the ALJ's assessment of her credibility was inappropriate.  He considered her previous filings for benefits; however, he disregarded her testimony about pain, other symptoms, medication therapy and the side effects.  Consequently, Plaintiff argues that the ALJ violated the rules stated in SSR 96-7p.  IN TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7p, 1996 WL 374186, *4, the ruling emphasizes that the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  *Id.*  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.  *Id.*

19

Embedded in our laws is the premise that the ALJ's findings as to credibility are entitled to deference because he or she has the opportunity to observe the claimant and assess his or her subjective complaints. *Olive v. Commissioner of Social Security,* 2007 WL 5403416, *9 (N. D. Ohio 2007) (*citing Cross v. Commissioner of Social Security,* 373 F. Supp.2d 724, 732 (N. D. Ohio 2005); *citing Buxton v. Halter,* 246 F.3d, 762, 773 (6th Cir. 2001)). A court may not disturb the ALJ's credibility determination absent compelling reason. *Id.* ( *citing Cross,* 373 F. Supp. 2d at 732; *Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001)). The regulations set forth factors that the ALJ should consider in assessing credibility. *Id.* These include the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain. *Id.* (*citing* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)). If the ALJ rejects the claimant's complaints as incredible, he or she must clearly state his reasons for doing so. *Id.* ( *Felisky, supra*, 35 F.3d at 1036).

Here, the reasons for finding that Plaintiff's testimony was not entirely credible are articulated in the decision (Tr. 25). The conclusion is supported by a clear statement of reasons including her daily activities. The reference to her previous filings placed in context the onset of her cerebral vascular accidents. The Magistrate doe not find that the ALJ's decision on credibility fails to comport with the requirements of SSR 96-7.

**11.** **The ALJ ignored the opinions of Mr. Avery and Dr. Montgomery as to Plaintiff's mental issues.**

Plaintiff argues that the ALJ ignored the opinions of Mr. Avery and Dr. Montgomery on mental issues. The Magistrate finds that the ALJ did not ignore the opinion of Mr. Avery or Dr. Montgomery. He cited Dr. Montgomery's opinion and he compared Mr. Avery's opinion with that of the state agency physician. Ultimately, he adopted the findings of the state agency physician because they were consistent with the formal test results administered by Mr. Avery.

20

**12.** **The ALJ wrongly analyzed Plaintiff's activities of daily living**.

Plaintiff argues that her ability to engage in activities of daily living does not transpose into an ability to do exertional activities. The ALJ's use of her activities of daily living was not appropriate.

Under 20 C. F. R. § 404. 1529, the ALJ will consider activities of daily living in evaluating the severity of physical or mental limitations. In this case, the ALJ properly assessed the severity of Plaintiff's impairments, not her ability to work (Tr. 25).

**13.** **The ALJ erred in posing the hypothetical based on the errors discussed in Plaintiff's brief.**

Plaintiff contends that in light of all of the aforementioned flaws, the hypothetical questions posed to the VE are flawed.

A hypothetical question must accurately portray the claimant's physical and mental impairments, if the hypothetical question, as phrased, has support in the record, it need not reflect the complaints of the Plaintiff that are not otherwise substantiated. *Rogers v. Commissioner of Social Security*, 2008 WL 618977, *2 (S. D. Ohio 2008). A hypothetical question need only include those limitations accepted as credible by the ALJ. *Id.* A VE's response to a hypothetical question that accurately portrays an individual's impairments, constitutes substantial evidence for determining whether a disability exists. *Id.* (*Citations omitted*).

During the hearing, the ALJ proposed hypothetical questions which included limitations he deemed credible. This does not violate the procedural rules. However, on remand, the ALJ should, in his or her discretion, pose hypothetical questions to a VE based on new evidence and/or findings, if any.

**14.** **The Commissioner failed to meet the burden at Step Five of the sequential evaluation**.

As a result of the hypothetical questions asked by Plaintiff's counsel, the VE eliminated all of the jobs that the hypothetical claimant could perform with the exception of one job. Plaintiff contends that one job is insufficient to meet the burden at Step Five of the sequential evaluation.

To make a finding that there is work available in the economy that the claimant can perform, the ALJ

21

must make a finding "supported by substantial evidence that claimant has the vocational qualifications to perform specific jobs." *Lindsley v. Commissioner of Social Security*, 2008 WL 886139, *3 (S. D. Ohio 2008) (*citing Varley v. Secretary,* 820 F.2d 777, 779 (6th Cir. 1987)).  Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the hypothetical question accurately portrayed the claimant's individual physical and mental impairments.  *Id.* In that regard, the ALJ is not required to mirror a medical report to a vocational expert in order to accurately state a claimant's relevant impairments.  *Id.* (*citing Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988)).

There is no medically determinable evidence of manipulative limitations related to the trigger thumb after surgery.  The evidence shows that Plaintiff noted a catching feeling in her right thumb (Tr. 410). Although the diagnostic imaging results showed no fracture, dislocation or osseous abnormality, Plaintiff underwent surgery to release the proximal pulley in what was diagnosed as a trigger thumb (Tr. 411, 412). The Magistrate does not find that the answer to the hypothetical question in which the hypothetical claimant had no fine manipulation skills, only occasional gross manipulation skills and problems holding things, constitutes substantial evidence that the stated limitations did not accurately reflect Plaintiff's physical impairment.

## **CONCLUSION**

For these reasons, it is recommended that the referral to the undersigned Magistrate be terminated and that this case be remanded, pursuant to Sentence Four of 42 U. S. C. 405(g) to:  make findings consistent with Section 404.1529, reassess Plaintiff's residual functional capacity based on all evidence, reassess Step five of the sequential evaluation based on the new residual functional capacity and conduct further hearing, if necessary, to determine if, based on the new residual functional capacity, Plaintiff can adjust to other work.

/s/ Vernelis K. Armstrong

22

United States Magistrate Judge

Date:   June 12, 2009

## NOTICE

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have ten (10) days after being served in which to file objections to said Report and Recommendation.  A party desiring to respond to an objection must do so within ten (10) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.